ARKANSAS STATE HIGHWAY COMMISSION
*v.* M.E. WITKOWSKI et ux

74-236                                                   519 S.W. 2d 743

Opinion delivered February 24, 1975
[Rehearing denied March 24, 1975.]

*Thomas B. Keys* and *Philip N. Gowen*, for appellant.

*Howell, Price, Howell & Barron*, for appellees.

CONLEY BYRD, Justice. The jury awarded compensation in this eminent domain proceeding in accordance with the testimony of C. V. Barnes, an expert witness called on behalf of appellees M. E. Witkowski, et ux. For reversal of the $155,-000 judgment the Arkansas State Highway Commission makes the following contentions:

"I. The court erred in denying appellant's motion to strike the before value testimony of C. V. Barnes, expert witness for the landowners.

II. The court erred in allowing appellees to establish in the presence of the jury that an appraiser who had made an appraisal of the subject property for appellant was not called to testify."

POINT I. The record shows that appellant condemned 79.35 acres which ran diagonally across appellees' ownership of 269 acres. C. V. Barnes testified for the landowner arriving at a total before valuation of $363,000 and an after valuation of $208,000. After testifying that he placed an assemblage value on the property, the record on direct examination shows:

"Q. What is assemblage value, explain that to the jury, please, sir?

A. Well, assemblage value can be made up of a number of things. First, assemblage primarily talks about size of Two Hundred Sixty Nine Acre parcel of ground such as the Witkowskis had is more flexible and conducive to development than like say a forty acre tract of ground because there are certain fixed expenses that have to be written off in any development and the larger the development, the more you have to write the fixed expenses off of. Also, when you have a development large enough to take advantage of multi-family and commercial use, why that goes into the element of assemblage.

Q. So that . . .

A. In a Forty acre tract, it would be very, very hard to

get commercial and multi-family and single family all on one tract of ground, so that when you get a large acreage that comprised of seven forty acre tracts, so to speak, you do have this capability.

Q. So the size of the property in other words, the size of this particular piece of property does increase its value in your opinion?

A. In my opinion, yes, sir."

On direct in showing how he arrived at his before value the witness testified as follows:

"Q. All right, sir, so in looking at the trend and using that as a factor in determining the fair market value of raw land in this area, particularly Mr. Witkowski's what did you come up with as to value per acre?

A. After making all of my studies and analysis, I came to the conclusion that Mr. Witkowski's property on the raw land basis and in let's say forty acre segments, more or less, had a value of a Thousand Dollars per acre.

Q. And you add to that, I believe you have already testified, you add to that . . .

A. Well, I didn't . . . let me back up and put it this way. I valued Mr. Witkowski's property before the taking at Thirteen Hundred and Fifty Dollars an acre, and as I just said, I felt like based on my study of the sales and there were no sales out there of Two Hundred and Sixty Nine acres, hunted all over that end of the world to find anything comparable in size, most of the market data was of the sizes that we have talked about, so I came to the conclusion that in small parcels or smaller parcels that the value of the property was a Thousand Dollars and that the fact that over a period of some four or five years, he had put this Two Hundred Sixty Nine acres together into one parcel, thereby increasing its potential and adaptability and all kinds of things, that it had an assemblage factor of Two Hundred Dollars per acre.

Q. Over and above the Thousand?

A. Over and above the Thousand, and that the improvements that had been constructed on the property made a contribution of a Hundred and Fifty Dollars per acre to the property and that's the way I got my Thirteen Hundred and Fifty Dollars per acre.

Q. Or Three Hundred and Sixty Three Thousand Dollars before market value.

A. That's correct.''

On cross-examination the witness testified that the property remaining had a value of $1100 per acre. With reference to the assemblage value the record shows only the following:

"Q. I want to ask you about that assemblage business. How did you arrive at that Two Hundred Dollars an acre assemblage value?

A. Well, based on judgment and experience, I would say, and based on the fact that the, for example, let's just talk about the three sales that Mr. Witkowski . . .

Q. I want to talk about them, go ahead.

A. One of the sales, of course, the highest price sale was for Eight Hundred and some odd dollars per acre and it had access. The other two sales, one at Five Hundred and the other at Six Hundred and Fifty Dollars, if I remember my figures about right, didn't have access and so that right there would indicate to me that property with access was worth more than that without and when the last two sales, for example, were purchased, that increased their value because they then had the same access as all the rest of them, so that's one of the factors that go to make up the assemblage value. Now, another thing is that when you talk about a small tract of ground like the Curtis sale which was the forty acre tract, the only potential for it would be . . . well, let's put it this way, the potential for a forty acre tract is not as

great as Two Hundred and Sixty Nine acres, when you get to Two Hundred and Sixty Nine acres, you've got a big enough unit to start planning and relating commercial and multi-family uses on the property where you cannot do that on smaller tracts and thus commercial potential created by putting smaller pieces together into a big block enhances its value."

The witness' definition of "assemblage" corresponds generally to the definition of "plottage" as defined in Black's Law Dictionary 4th Ed. — *i.e.*, "A term used in appraising land values and particularly in eminent domain proceedings, to designate the additional value given to city lots by the fact that they are contiguous which enables the owner to utilize them as large blocks of land." However, this is a separate and distinct item from that which occurs when access is given to a landlocked tract because in the latter instance the enhancement in value accrues only to the landlocked portion whereas the enhancement from "assemblage" or "plottage" is to the whole property.

We readily recognize that "assemblage" or "plottage" is an element that may be taken into consideration in arriving at the valuation of property but like all other elements to which a damage factor is assigned an expert witness on cross-examination must demonstrate that he has some reasonable basis for assigning a particular amount of damage. In this instance the $200 figure comes to 20% of the value of the land and if we should accept his answer that the $200 figure is based ". . . on judgment and experience" then we know of no rationale that would prevent the same witness from using a $2000 figure.

However, at the outset we are confronted with the problem that the only motion to strike was made at the close of the direct examination of the witness. Of course, at that time the trial court properly refused the motion to strike, *Ark. State Highway Comm. v. Johns*, 236 Ark. 585, 367 S.W. 2d 436 (1963). The motion to strike was not renewed at the end of the cross-examination. Consequently, appellant is not in a position to claim error on the part of the trial court, *Mo-Pac R.R. v. McDaniel*, 252 Ark. 586, 483 S.W. 2d 569 (1972).

In its argument appellant proceeds on the theory that there is no substantial evidence to support the award but it cannot avail on this issue because at least one other expert arrived at a difference between a before and after value of $164,000 and it is not contended that he had no basis for his opinion.

POINT II.   In accordance with our decision in *Arkansas State Highway Commission* v. *Phillips*, 252 Ark. 206, 478 S.W. 2d 27 (1972), the landowners submitted evidence to the jury to show that the Highway Commission had used a number of appraisers to appraise the property in question that were not called to testify. Admittedly this was done to raise the inference that the testimony of those witnesses would have been unfavorable to the condemnor. The Highway Commission recognizes the binding effect of the *Phillips'* case, *supra,* but requests that we reconsider the issue. While we cannot say that the trial court erred in following the *Phillips'* case, *supra,* we note that it was not a unanimous decision and that it is decidedly contrary to a majority of the other jurisdictions that have considered the issue — see *Boyles* v. *Houston Lighting and Power Company*, 464 S.W. 2d 359 (Tex. 1971); *Lutsko* v. *Commonwealth Department of Transp.*, 13 Pa. Comwlth. 150, 318 A. 2d 361 (1974); and *State Ex rel State Highway Com'n* v. *Texaco Inc.*, 502 S.W. 2d 284 (Mo. 1973). For cases involving related issues see *Logan* v. *Chatham County*, 113 Ga. App. 491, 148 S.E. 2d 471 (1966) and *Whitcomb* v. *Whitcomb*, 267 S.W. 2d 400 (Ky. 1954). Consequently, with respect to all cases being tried after the effective date of this opinion, we give the bench and bar notice that the issue involved in the *Phillips'* case, *supra,* will be reconsidered.

Affirmed.

FOGLEMAN and HOLT, JJ., concur.

JOHN A. FOGLEMAN, Justice, concurring. I concur in both the result and the majority opinion with reference to the testimony of the expert witness Barnes. I would affirm, however, even if a motion had been made to strike his testimony after cross-examination or at the conclusion of all his testimony.

I cannot, however, subscribe to the caveat that the evidentiary rule stated and applied in *Arkansas State Highway Commission* v. *Phillips*, 252 Ark. 206, 478 S.W. 2d 27, is subject to reconsideration less than three years later, during which time nothing has really changed. The discovery that the court was not unanimous certainly is not a recent or surprising one. The original ruling we approved in *Phillips* was made by one of the most eminent jurists ever gracing the trial bench in this state. It is supported by no less eminent authority than Professor Wigmore and for sound reasons. If there has been expert shopping by either a plaintiff or a defendant the jury has a right to know it, whether the case be in eminent domain, for personal injuries, or whatever. The question is not actually suppression of evidence. It is nonproduction.

The principle followed in *Phillips* was applied in *United States* v. *Certain Land in City of Fort Worth, Texas*, 414 F. 2d 1026 (5 Cir., 1969), where the court commented that the expert hired by the government but not called by it to testify was a recognized and qualified land appraiser.

It should be noted that in practically all those jurisdictions holding contrary to *Phillips*, the result is based to a great extent upon the premise that the expert witness is just as available to the adverse party as he is to the one by whom he was employed. Those cases cited in the majority opinion are: *Boyles* v. *Houston Lighting & Power Co.*, 464 S.W. 2d 359 (Tex. 1971); *Lutsko* v. *Commonwealth Department of Transp.*, 318 A. 2d 361 (Pa. Commonwealth, 1974); *Logan* v. *Chatham County*, 113 Ga. App. 491, 148 S.E. 2d 471 (1966); *Whitcomb* v. *Whitcomb*, 267 S.W. 2d 400 (Ky. 1954). Not cited there are *State Highway Commission* v. *Earl*, 82 S.D. 139, 143 N.W. 2d 88 (1966); *Department of Public Works and Buildings* v. *Guerine*, 19 Ill. App. 3d 509, 311 N.E. 2d 722 (1974). The validity of that premise is certainly subject to question. It does not prevail in favor of a private litigant in the majority of jurisdictions that have passed upon the question.

It is quite generally held that the state in the exercise of its sovereign power may compel a witness to testify as an expert in matters affecting the common welfare, particularly in criminal cases. 31 Am. Jur. 2d 504, Expert and Opinion

Evidence § 10; 97 C.J.S. 365, Witnesses, § 16. This rule has been recognized and applied in Arkansas but not extended to private litigants. See *St. Francis County* v. *Cummings*, 55 Ark. 419, 18 S.W. 461; *Flinn* v. *Prairie County*, 60 Ark. 204, 29 S.W. 459. As a matter of fact the language used in *Flinn* would seem to confine the rule to cases related to the enforcement of criminal laws. We said:

> . . . . It is the duty of every citizen to assist, within reasonable limits, in enforcing the criminal law of the state; and it is not unreasonable that he should be required, on behalf of the state, to give such information as he may possess towards the elucidation of any question arising in a criminal trial, whether that information be in the nature of expert evidence or not. He cannot be required to make any examination or preliminary preparation, nor can he be compelled to attend the trial, and listen to the testimony, that he may be better enabled to give his opinion as an expert. For any service of this kind he may demand extra compensation. But such information as he already possesses, that is pertinent to the issue, he can be made to give, whether such information is peculiar to his trade or profession, or not. There is very little probability of any great hardship being imposed on physicians by reason of this rule.

I submit that *State ex rel State Highway Commission* v. *Texaco, Inc.*, 502 S.W. 2d 284 (Mo. 1973), the only remaining case cited in the majority opinion, does not support the position contrary to that of *Phillips*. In the Missouri case, the landowner moved to strike the testimony of three expert valuation witnesses on the ground that the state withheld an appraisal by a fourth such expert more favorable to the landowner than the other three. The landowner sought to equate this action with that of the state in *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), where evidence favorable to the defendant was withheld by the state. Naturally the court held *Brady* inapplicable. Furthermore, there the landowner knew the value put on his land by this expert.

It is also generally held that an expert cannot be com-

pelled, if unwilling, to give opinion testimony at the request or for the benefit of a private litigant. *United States* v. *$5,608.30,* 326 F. 2d 359 (7 Cir. 1964); *Cold Metal Process Co.* v. *United Engineering and Foundry Co.*, 83 F.S. 914 (W.D. Pa., 1938) affirmed 107 F. 2d 27 (3 Cir., 1939); *Evans* v. *Otis Elevator Co.*, 403 Pa. 13, 168 A. 2d 573 (1961); *Braverman* v. *Braverman*, 21 N.J. Super 367, 91 A. 2d 226 (1952); *People* v. *Thorpe*, 296 N.Y. 223, 72 N.E. 2d 165 (1947); *Karp* v. *Cooley*, 349 F.S. 827 (1972), 97 CJS 366, Witnesses § 16; 31 Am. Jur. 2d 504, Expert and Opinion Evidence, § 10; Annot, Compelling Expert to Testify, 77 ALR 2d 1182 (1961).

The general rule that the expert may not be compelled to testify has been applied in eminent domain cases. See, e.g., *Pennsylvania Co. for Insurances on Lives and Granting Annuities* v. *City of Philadelphia*, 262 Pa. 439, 105 A. 630, 2 ALR 1573 (1918); *Reda* v. *State*, 62 Misc. 2d 244, 308 N.Y.S. 2d 558 (1970); *L'Etoile* v. *Director of Public Works*, 89 R.I. 394, 153 A. 2d 173, 77 ALR 2d 1174 (1959).

In *Pennsylvania Co.* v. *City of Philadelphia*, supra, the leading case on the subject, the condemner in an eminent domain case subpoenaed as expert witnesses two real estate men who objected to testifying because they had previously been employed by the landowner and had reported to him. The trial court sustained the objection on the ground that the witnesses maintained a confidential relationship with the landowner. The Pennsylvania Supreme Court said:

> We think it unnecessary to decide whether or not the reason for sustaining the objection is a sound one, in view of the fact that the witnesses themselves objected to being required to testify as experts. The process of the courts may always be invoked to require witnesses to appear and testify to any facts within their knowledge; but no private litigant has a right to ask them to go beyond that. The state or the United States may call upon her citizens to testify as experts in matters affecting the common weal, but that is because of the duty which the citizen owes to his government, and is an exercise of its sovereign power. So, also, where the state or the United States in her sovereign capacity, charges the

citizen with crime, she may, if need be, lend her power in that regard to the accused; for she is vitally interested, as such sovereign, that public justice shall be vindicated within her borders. Perhaps, also, under like circumstances, she may also lend her power in civil cases. But the private litigant has no more right to compel a citizen to give up the product of his brain than he has to compel the giving up of material things. In each case it is a matter of bargain, which, as ever, it takes two to make, and to make unconstrained.

One of the reasons why experts are not as readily available to the adverse party as to the party by whom he was employed is well expressed in language of the N.J. Court of Errors and Appeals in *Stanton* v. *Rushmore*, 112 N.J. Law 115, 169 A. 721 (1934), where the court held that expert testimony cannot be compelled. That court said:

It is quite clear, and no argument is required to demonstrate, that all knowledge which one has of the actual facts of a litigation, whether the witnesses to those facts be professional or lay, is available and such witnesses thereof amenable to subpeona and compellable to give evidence of such facts. On the other hand, when the experience, training, and skill acquired by years of study and practice in a given profession or calling exists, such knowledge and skill are not the property of litigants. It belongs to the professional man in his chosen occupation. Neither justice nor public policy in our view forbids that the expert shall retain such knowledge and skill free from divulgement except by his voluntary acquiescence, whether it be sought for compensation in the exercise of his skill, in the expression of his professional judgment privately, or when he is called for that purpose into a court of justice.

I submit that if we are to reconsider the *Phillips* rule because of holdings of cases such as those cited in the majority opinion, we must also adopt the corollary which furnishes the rationale on which those cases are based, i.e., that the expert witness is as available to the adverse party as he is to the party by whom he was employed and that he can be compell-

ed to testify. I cannot envision any enthusiasm for the adoption of such a rule by the trial bar of this state. No trial attorney could approach the presentation to a jury of an opinion coerced from a reluctant or recalcitrant witness with enthusiasm. Such a witness could never be said to be one the party opposing the one by whom he was originally employed would, in the nature of things, be expected to call if his testimony was not adverse. To say the least, a trial lawyer faced with the prospect of calling his adversary's expert would never agree that such a witness was "equally available" to him.

The rule of *Phillips* is right and we should adhere to it without suggestion that someone at the trial level should not.

I am authorized to state that Mr. Justice Holt joins in this opinion.